# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | NO. CR 08-1098 RB |
| ) | |
| SHELDON ANTHONY REYNOLDS, ) | |
| ) | |
| Defendant. ) | |

### MEMORANDUM OPINION AND ORDER

**THIS MATTER** came before the Court on Defendant's (Mr. Reynolds') Motion for a New Trial (Doc. 138), filed on August 10, 2009. Having considered the record, submissions of counsel, relevant law, and being otherwise fully advised, I find that this motion should be granted in the interest of justice based on the suppression of *Giglio* material by the prosecution and newly discovered evidence.

**I.      Background.**

On August 18-21, 2008, Mr. Reynolds and Co-Defendant, Ronald Kirk Whitaker ("Mr. Whitaker"), were tried before a jury and found guilty of: (1) conspiracy to possess with intent to distribute 100 kilograms and more of marijuana in violation of 21 U.S.C. §846; and (2) possession with intent to distribute 100 kilograms and more of marijuana in violation of 21 U.S.C. §§841(a)(1) and (b)(1)(B), and aiding and abetting in violation of 18 U.S.C. § 2. Mr. Reynolds currently awaits sentencing. Mr. Whitaker filed a Motion for a New Trial on March 3, 2009 (Doc. 107), which was granted on May 13, 2009. (Doc. 114.) Mr. Whitaker's new trial is set for January 19, 2010. (Doc. 152.)

**II.      Standard.**

Rule 33(a) of the Federal Rules of Criminal Procedure permits a court to vacate a conviction and grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). A motion for a new trial filed more than seven days after the verdict must be grounded on newly discovered evidence. Fed. R. Crim. P. 33(b). Since Mr. Reynolds filed his motion more than seven days after the verdict, newly discovered evidence is the only ground available to Mr. Reynolds for a new trial. *United States v. Herrera*, 481 F.3d 1266, 1270 (10th Cir. 2007). The motion, filed within a year of the verdict, is timely. *See* Fed. R. Crim. P. 33(b)(1) ("[a]ny motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty.").

"A motion for a new trial based on newly discovered evidence is generally disfavored and should be granted only with great caution." *United States v. Gwathney*, 465 F.3d 1133, 1143 (10th Cir. 2006) (internal quotation marks omitted). Where the basis for the motion is "merely newly" discovered evidence, "and there is no claim that evidence was improperly withheld," the defendant must show that:

> (1) the evidence was discovered after trial; (2) the failure to learn of the evidence was not caused by his own lack of diligence; (3) the new evidence is not merely impeaching; (4) the new evidence is material to the principal issues involved; and (5) the new evidence is of such a nature that, in a new trial, it would probably produce an acquittal.

*United States v. Redcorn*, 528 F.3d 727, 743 (10th Cir. 2008) (citations omitted); *see also United States v. Sinclair*, 109 F.3d 1527, 1531-32 (10th Cir. 1997) (reaffirming applicability of the probability standard). The Tenth Circuit reviews the denial of a motion for a new trial based on such newly discovered evidence for abuse of discretion. *Gwathney*, 465 F.3d at 1144.

Where the defendant seeks a new trial based on a claimed violation of *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the five-factor test is inapplicable. *United States v. Torres*, 569 F.3d 1277,

1281 (10th Cir. 2009) (citations omitted). "A defendant who seeks a new trial based on an alleged *Brady* violation must show that (1) the prosecution suppressed evidence, (2) the evidence was favorable to the defendant, and (3) the evidence was material." *United States v. Velarde*, 485 F.3d 553, 558 (10th Cir. 2007) (internal quotation marks omitted). "If these three factors are satisfied, regardless of the prosecution's intentions in suppressing the evidence, a new trial is justified." *Torres*, 569 F.3d at 1281.

This same three-factor standard applies when a defendant seeks a new trial based on alleged withholding of impeachment materials in violation of *Giglio v. United States*, 405 U.S. 150, 154 (1972). Where "the reliability of a given witness may well be determinative of guilt or innocence, non-disclosure of evidence affecting credibility falls within this general rule." *Torres*, 569 F.3d at 1281. The Tenth Circuit reviews a *Brady* or *Giglio* claim asserted in the context of a motion for a new trial de novo, with any factual findings reviewed for clear error. *United States v. Mendez*, 514 F.3d 1035, 1046 (10th Cir. 2008).

**III.    Discussion.**

**A.    Mr. Reynolds is entitled to a new trial based on *Giglio* violations.**

A few months after the verdict, DEA Task Force Officer David Metz of Des Moines, Iowa contacted the case agent, DEA Special Agent Joseph Montoya of the Las Cruces, New Mexico DEA Office. For the first time, Special Agent Montoya learned that there was an ongoing investigation pertaining to a Jamaican drug ring that potentially involved Mr. Reynolds and Dwight Brown, the owner of the tractor-trailer at issue and a government trial witness. Special Agent Montoya was not provided with DEA reports (hereinafter "Reports") concerning the ongoing Iowa investigation at that time. The Court fully credits the representations of Assistant United States Attorney Maria Armijo that she and Special Agent Montoya had no knowledge of the Iowa investigation until well

after the trial. The Court emphasizes that it maintains complete confidence in the professional integrity of the entire prosecution team.

On April 1, 2009, Assistant United States Attorney Maria Armijo submitted the Reports to the Court for in camera review in connection with Mr. Whitaker's motion for a new trial. The Reports have neither been filed in the court record, nor disseminated by the Court.

The Reports indicate that the DEA had investigated Mr. Reynolds and other individuals, including a "Dwight LNU (LANKY)" since 2001. In April 2009, Agent Metz determined that "Dwight LNU (LANKY)" is Dwight Brown.[1] (Doc. 142 at 6, Redacted Reports at 277.) The Reports indicate Mr. Brown and Mr. Reynolds were involved in a conspiracy responsible for moving thousands of pounds of marijuana across the country by semi-truck, along with legitimate shipments of cargo. Members of the conspiracy rented and stayed at a house in Phoenix, Arizona.

In a July 21, 2009 Memorandum Opinion and Order denying Mr. Reynolds' Emergency Motion for Access to Court Records, this Court stated, "based on the extensive information in the Reports detailing Mr. Reynolds' long-term involvement in a conspiracy to transport marijuana across the country by semi-truck with legitimate cargo, the Reports are not exculpatory as to Mr. Reynolds . . . . [and the Reports] directly inculpate Mr. Reynolds." (Doc. 132 at 6.) The Court directed the government to comply with its discovery obligations by July 31, 2009. (*Id*.)

The government provided Mr. Reynolds with redacted pages of the Reports, and copied the Court with these redacted pages on September 9, 2009. The redacted pages indicate that Dwight LNU and Mr. Reynolds were involved in transporting marijuana from California to New York by semi-truck with legitimate cargo. Mr. Reynolds states that "[i]t is clear from these documents that

---

[1] Mr. Reynolds testified at trial that Mr. Brown's nickname is "Lanks" because Mr. Brown is tall and lanky. (Trial Tr. Vol. III, 484.)

all the government had to do was do a NADDIS search on Mr. Reynolds' address . . . and information on "Dwight" would have immediately been revealed." Indeed, the redacted pages indicate that "Dwight aka Lanky" was indexed by the DEA as far back as June 2003.

While the Reports are not per se exculpatory as to Mr. Reynolds within the meaning of *Brady*, the Reports would have impeached Mr. Brown, a key government trial witness. *Torres*, 569 F.3d at 1281 (stating that where "the reliability of a given witness may well be determinative of guilt or innocence, non-disclosure of evidence affecting credibility" calls for a new trial). While the Court recognizes that the prosecution had no knowledge of the Reports until after the trial, the impeachment information as to Mr. Brown would have been subject to disclosure under *Giglio*. Indeed, the prosecution recognized as much when it disclosed the redacted pages from the reports.

The prejudicial effect of the non-disclosure is underscored by the fact that Mr. Reynolds was convicted primarily on circumstantial evidence. Mr. Brown's testimony that Mr. Brown had no knowledge of the secret compartment or the marijuana may well have been determinative of the jury's finding of guilt. Under these circumstances, I find that the interests of justice require a new trial for Mr. Reynolds due to the non-disclosure of the redacted pages from the Reports concerning Mr. Brown.

**B.     Mr. Reynolds is entitled to a new trial based on newly discovered evidence.**

Mr. Reynolds asserts that he is entitled to a new trial based on the following newly discovered evidence: (1) post-trial investigation revealed that Dwight Brown's explanation for his inability to drive the truck to Phoenix and back was a fabrication; (2) Mr. Brown directed Mr. Reynolds and Mr. Whitaker to drive the truck to Atlanta on their way from Phoenix to New York and Pennsylvania; (3) post-trial investigation has revealed inconsistencies regarding the sale of the refrigerated trailer; (4) Mr. Brown directed Mr. Reynolds and Mr. Whitaker to leave the refrigerated

trailer for repairs in Phoenix; (5) Mr. Brown directed Mr. Reynolds and Mr. Whitaker to pick up pallets from a company known to be involved in illegal activities; (6) Mr. Brown possesses unexplained wealth; and (7) the evidence at trial showed the inherent implausibility of Mr. Brown's lack of knowledge of the hidden compartment and the marijuana.

### 1. Mr. Brown's explanation for his inability to drive the tractor-trailer to Phoenix.

The government called Mr. Brown to testify at trial. (Trial Tr. vo1. II, 173.) Mr. Brown testified that he does business as D.B. Transportation Services and owns a blue Peterbuilt tractor, the refrigerated trailer, and a non-refrigerated trailer. (Trial Tr. vo1. II, 174-178.) Mr. Brown purchased the refrigerated trailer from Edge Trucking in Phoenix for $20,000 in April 2008. (Trial Tr. vo1. II , 185.)

Mr. Brown and Mr. Whitaker both lived in Georgia and, at the time of trial, had known each other for about a year and a half. (Trial Tr. vo1. II , 180-183.) Mr. Brown employed Mr. Whitaker as his co-driver. (Trial Tr. vo1. II , 180.) Mr. Reynolds lived in New York and had known Mr. Brown for over three years. (Trial Tr. vo1. II, 183.) Mr. Brown agreed to train Mr. Reynolds to work as a tractor-trailer driver. (Trial Tr. vo1. II , 183.) Mr. Reynolds had taken a couple of trips with Mr. Brown. (Trial Tr. vo1. II , 183.) In fact, Mr. Brown and Mr. Reynolds completed a trip from the east coast to Phoenix and back with the refrigerated trailer in late April 2008. (Trial Tr. vo1. II, 186.)

In May 2008, Mr. Brown was in Pennsylvania to pick up a load of grapes bound for Casa Grande, Arizona. (Trial Tr. vo1. II, 187.) Mr. Brown called Mr. Reynolds to ask if he wanted to go on the trip. (*Id*.) Mr. Reynolds agreed, and Mr. Brown picked up Mr. Reynolds in New York. (Trial Tr. vo1. II, 187.) Mr. Brown and Mr. Reynolds then proceeded to Georgia and picked up Mr. Whitaker. (Trial Tr. vo1. II, 187.) Once in Georgia, Mr. Brown asked Mr. Reynolds and Mr.

6

Whitaker to drive the truck to Phoenix without Mr. Brown because Mr. Brown had "family arrangements to go to" and he needed to "take care of family issues." ( Trial Tr. vo1. II, 188.) Mr. Brown testified at trial, on direct examination, that he had an appointment to sign up his child for school. (Trial Tr. vo1. II, 188.) On cross examination, Mr. Brown testified that the school required both parents to be present to register a child. (Trial Tr. vo1. II, 215.)

The May 2008 trip was the first trip on which Mr. Reynolds and Mr. Whitaker drove together. (*Id.*) On May 16, 2008, Mr. Reynolds and Mr. Whitaker were apprehended with the load of marijuana as they were headed back to the east coast from Arizona on this trip. (Doc. 1.)

Mr. Reynolds states that his post-trial investigation has revealed that Mr. Brown's wife, Karen, does not work outside the home and she was available to register the child for school. The investigation also revealed that, contrary to the testimony of Mr. Brown, the school does not require both parents to be present for registration.

A new trial is not warranted if the new evidence is such that, with reasonable diligence, it could have been discovered and produced at the original trial. *United States v. Hughes*, 33 F.3d 1248, 1252 (10th Cir. 1994) (citation omitted). The Court recognizes that Mr. Reynolds should have been aware of this evidence before trial. However, had defense counsel discovered this information, it would have provided additional impeachment of Mr. Brown that may have altered the outcome of the trial.

### 2. Mr. Brown allegedly instructed Mr. Reynolds and Mr. Whitaker to drive the tractor-trailer through Atlanta en route to Pennsylvania and New York.

Mr. Reynolds alleges that Mr. Brown instructed Mr. Reynolds and Mr. Whitaker to drive through Atlanta on their way from Phoenix to Pennsylvania and New York with the load of milk. Mr. Reynolds does not provide a citation to the record for this assertion. Mr. Brown testified that

7

he expected Mr. Reynolds and Mr. Whitaker to complete the delivery of the milk so he "could split the payments easy." (Trial Tr. vo1. II, 219.) Mr. Brown additionally testified that he did not have any control over the route taken, so long as the milk was delivered on time. (Trial Tr. vo1. II, 223.)

Nonetheless, Mr. Reynolds posits that he is entitled to a new trial because "[t]he interval in Atlanta would have given Mr. Brown the opportunity to unload the marijuana without Mr. Reynolds' knowledge" and "the diversion to Atlanta . . . [was] . . . out of the way" and unwarranted due to the perishable nature of the milk. (Doc. 138 at 11.)

The assertion that the stop in Atlanta would have allowed Mr. Brown to offload the marijuana is purely speculative. Moreover, if Mr. Brown had directed Mr. Reynolds and Mr. Whitaker to divert their trip through Atlanta, Mr. Reynolds would have been aware of this evidence and could have cross examined Mr. Brown about it at trial. This evidence is not newly discovered because it could have been produced at the original trial.

### 3. Inconsistencies regarding the sale of the refrigerated trailer.

Mr. Reynolds contends he is entitled to a new trial because his post-trial investigation revealed inconsistencies regarding the sale of the refrigerated trailer. At trial, Mr. Reynolds called David Gomez to testify about the sale of the refrigerated trailer. Mr. Gomez testified that he was a minority partner in Edge Trucking and an employee of McKelvey Trucking, which are located on the same site in Phoenix. (Trial Tr. vo1. II, 331.) Mr. Gomez testified on direct that he sold the refrigerated trailer at issue to Manuel Santos on April 4, 2008, for $14,000 cash. (Trial Tr. vo1. II, 332.)

Mr. Gomez testified that, when Mr. Santos arrived at Edge Trucking, Mr. Gomez had prepared a bill of sale listing the price as $14,000. (Trial Tr. vo1. II, 334.) During the transaction, Mr. Santos asked Mr. Gomez to give him a second bill of sale with the price listed as $20,000

"because it would be really good for [Mr. Santos'] taxes." (Trial Tr. vo1. II, 335.) After Mr. Gomez complied, Mr. Santos handed over the $14,000 in cash and asked when the refrigerated trailer would be ready. (Trial Tr. vo1. II, 335-336.) Mr. Gomez explained that the refrigeration system on the trailer needed to be repaired and the title had not come in. (Trial Tr. vo1. II, 335.) For these reasons, Mr. Gomez asked Mr. Santos to return in a few days. (Trial Tr. vo1. II, 335.) Mr. Santos agreed and said he would call Mr. Gomez in a couple of days. (Trial Tr. vo1. II, 335-336.) Mr. Santos then left with the two bills of sale. (Trial Tr. vo1. II, 335-336.)

A few days later, Mr. Santos returned and picked up the refrigerated trailer with a white Freightliner tractor. (Trial Tr. vo1. II, 336.) The bills of sale were admitted into evidence as Government's Exhibits 37 and 38. (Trial Tr. vo1. II, 338.) The buyer was listed on the bills of sale as D.B. Transportation Services, Inc. of Covington, Georgia. (Trial Tr. vo1. II, 344; 352.)

In support of his motion for a new trial, Mr. Reynolds states that, on March 14, 2009, Mr. Gomez provided a defense investigator with documents showing that Mr. Gomez purchased the refrigerated trailer on April 8, 2008 from Transport International Pool, Inc. for $10,701.90. (Doc. 138-2 through 138-6.) Mr. Gomez also provided the investigator with the bill of sale reflecting that Mr. Gomez sold the refrigerated trailer to D.B. Transportation on April 4, 2008, which was four days before Mr. Gomez purportedly purchased it. Mr. Reynolds reasons that, because the paperwork reflects that Mr. Gomez purchased the refrigerated trailer four days after he sold the refrigerated trailer, Mr. Gomez is not credible.

Mr. Gomez was a defense witness. The trial testimony of Mr. Gomez contradicted statements Mr. Gomez made to defense counsel and investigators on July 21, 2008. While Mr. Gomez's testimony concerning the sale did not directly implicate Mr. Reynolds, it was inconsistent with the trial testimony of Defendants and Mr. Brown. Evidence that undermined the credibility of

9

Mr. Gomez may have served to bolster the credibility of Defendants and altered the outcome of the trial.

### 4. Inconsistencies regarding the repair of the refrigerated trailer.

Mr. Reynolds asserts that he should be granted a new trial because his post-trial investigation revealed inconsistencies regarding the repair of the refrigerated trailer. At trial, Mr. Brown testified that he instructed Mr. Whitaker to take the refrigerated trailer in for repairs at Edge Trucking because the indicator light showed a malfunction in the refrigeration system. (Trial Tr. vo1. II, 190.) Mr. Brown testified that Mr. Whitaker took the refrigerated trailer to Edge Trucking for repairs, the repairs took three days, and Mr. Whitaker reported back to Mr. Brown that the problem was fixed. (Trial Tr. vo1. II, 191-192.)

Mr. Reynolds testified at trial that the refrigeration unit on the refrigerated trailer was malfunctioning and the tractor was pulling to one side. (Trial Tr. vo1. II, 419.) Mr. Brown gave Mr. Whitaker the phone number of Edge Trucking, which he referred to as the place where Mr. Brown had purchased the refrigerated trailer, and instructed Mr. Whitaker to drop off the tractor and refrigerated trailer for repairs. (Trial Tr. vo1. II, 420.) Mr. Reynolds testified that he and Mr. Whitaker dropped off the truck and the refrigerated trailer at Edge Trucking. (Trial Tr. vo1. II, 421-422.)

Mr. Whitaker testified at trial that the refrigeration system on the trailer was malfunctioning and the tractor was pulling to the left. (Trial Tr. vo1. III, 494.) Mr. Brown instructed Mr. Whitaker to have the tractor and refrigerated trailer serviced at Edge Trucking. (Trial Tr. vo1. III, 495; 497.) Mr. Whitaker testified that he and Mr. Reynolds dropped both the tractor and the refrigerated trailer off at Edge Trucking for repairs. (Trial Tr. vo1. III, 497-498.)

On cross examination by the government at trial, Mr. Gomez testified that, on May 12-15,

Edge Trucking repaired a tractor for D.B. Transportation. (Trial Tr. vo1. II , 341-343; 349.) A Mexican man, who was not Mr. Santos, brought the tractor in. (Trial Tr. vo1. II, 343.) Mr. Gomez did not see the refrigerated trailer. (*Id.*) However, the estimate contained a quote for preventative maintenance on the refrigerated trailer. (*Id.*) The estimate and invoice for the repair work were admitted as Government Exhibit 39. (Trial Tr. vo1. II, 342.)

Mr. Whitaker called Josh Lundquist, a Service Manager at Edge Trucking, to testify at trial. Mr. Lundquist testified that he prepared an estimate for repair work on both the tractor and the refrigerated trailer. (Trial Tr. vo1. II, 358-359.) Mr. Lundquist explained in his testimony that the invoice showed that Edge Trucking replaced the shackle pins, front springs, and air box on the tractor. (Trial Tr. vo1. II, 360-361.) Mr. Lundquist testified that no work was performed on the refrigerated trailer. (Trial Tr. vo1. II, 359.)

In his testimony, Mr. Lundquist recalled that a Hispanic man who spoke Spanish brought the tractor in for the repairs. (Trial Tr. vo1. II, 365.) Mr. Lundquist explained that the refrigerated trailer could have been dropped off in the Edge Trucking yard, and picked up, without the knowledge of Edge Trucking employees.

Mr. Reynolds points out that the $20,000 bill of sale shows that the refrigerated trailer was sold to Mr. Brown "as is." (Doc. 138-2.) Based on this, Mr. Reynolds surmises that Edge Trucking had no duty to correct the malfunction and Mr. Brown's instruction to take the refrigerated trailer to Edge Trucking was "evidently part of Mr. Brown's effort to conceal from Mr. Reynolds (and possibly Mr. Whitaker) the fact that Mr. Brown was transporting marijuana from Phoenix to Atlanta inside the truck owned by Mr. Brown." (Doc. 138 at 15.) In light of the other inconsistencies in the trial evidence concerning the repair, this evidence would have been helpful to Mr. Reynolds.

Mr. Reynolds contends that the trial testimony of Mr. Lundquist contradicted a statement Mr.

Lundquist gave to defense counsel and investigators on July 21, 2008, wherein Mr. Lundquist stated that the refrigerated trailer was connected to the tractor. In his March 18, 2009 post-trial interview with the defense investigator, Mr. Lundquist stated that a Hispanic man dropped off and picked up both the tractor and the refrigerated trailer. Considered in isolation, the inconsistency between the trial testimony and the statements of Mr. Lundquist concerning whether or not he saw the refrigerated trailer dropped off and picked up along with the tractor does not provide a basis for a new trial. However, in conjunction with the myriad inconsistencies and the circumstantial evidence upon which the conviction was based, this evidence may have altered the outcome.

### 5. Instruction to pick up pallets from a company known to be involved in illegal activities.

Mr. Reynolds states that Mr. Brown instructed Mr. Reynolds and Mr. Whitaker to stop and pick up pallets from a company that was mentioned in another, unnamed drug smuggling case and the workers at the company fled when a defense investigator arrived to interview them. Mr. Reynolds acknowledges that the investigator could not locate anyone to speak to about the matter. Mr. Reynolds' allegations concerning this company do not constitute newly discovered evidence that would warrant a new trial.

### 6. Mr. Brown possesses unexplained wealth.

Mr. Reynolds states that post-trial investigation had revealed that Mr. Brown possesses unexplained wealth, lives in a mansion, and owns a second residence. Mr. Reynolds has not shown that he could not have discovered this evidence before trial through the exercise of reasonable diligence. *See United States v. LaVallee*, 439 F.3d 670, 701 (10th Cir. 2006) (noting that a defendant seeking a new trial based on newly discovered evidence must show that he exercised reasonable diligence to locate the evidence prior to trial).

Mr. Brown testified at trial that he owned a Peterbuilt tractor, paid $20,000 cash for the refrigerated trailer, and gave Mr. Whitaker and Mr. Reynolds $6,000 in cash to fund their trip. There is nothing particularly remarkable about the fact that a small business owner, such as Mr. Brown, owned a primary residence and a second property, which he listed on the bill of sale as his business address.  If considered in isolation, evidence of Mr. Brown's wealth is not of such a nature that, in a new trial, it would probably produce an acquittal.  However, this was an extremely close case.  When considered in conjunction with the other newly discovered evidence, as well as the evidence adduced at trial, evidence of Mr. Brown's wealth could have tipped the balance in favor of Mr. Reynolds.

### 7. The evidence at trial showed the inherent implausibility of Mr. Brown's lack of knowledge of the hidden compartment and the marijuana.

Counsel for Mr. Reynolds argued at trial that Mr. Brown must have been involved in the conspiracy.  The trial evidence of Mr. Reynolds' knowledge of the marijuana was purely circumstantial.  When considered in isolation, Mr. Reynolds' assertions would not necessarily provide a sufficient basis for a new trial.  However, when considered as a whole in light of the circumstantial nature of the evidence and the pivotal role of the testimony of Dwight Brown, I am firmly convinced that the interest of justice requires a new trial for Mr. Reynolds.

Having considered the newly discovered evidence as a whole, the Court finds that Mr. Reynolds has satisfied the five-part test applied by the Tenth Circuit to Rule 33 motions based on newly discovered evidence.  *See United States v. Redcorn*, 528 F.3d at 743; *United States v. Sinclair*, 109 F.3d at 1531-32.  In sum, the evidence was discovered after trial, the failure to learn of the evidence was not caused by Mr. Reynolds' lack of diligence, the evidence is not merely impeaching, the evidence is material to the principal issues involved, and the evidence is of such a nature that in

a new trial it would probably produce an acquittal.  *See Redcorn*, 528 F.3d at 743.  Accordingly, Mr. Reynolds is granted a new trial based on newly discovered evidence.

**IV.    Conclusion.**

Rule 33(a) permits the Court to grant a new trial "if the interest of justice so requires."  Fed. R. Crim. P. 33(a). Mr. Reynolds has shown he is entitled to a new trial based on the suppression of *Giglio* material by the prosecution and newly discovered evidence.  Having considered the arguments of counsel, record in this case, and the relevant law, the Court concludes that the interest of justice requires a new trial for Mr. Reynolds.

**WHEREFORE,**

**IT IS ORDERED** that Defendant Reynolds' Motion for a New Trial (Doc. 138), filed on August 10, 2009, is **GRANTED**.

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**